**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 14-2096**

─────────────

BARRY A. HARRISON; WESLEY T. ROACH; DWAYNE M. HAWKINS,

               Plaintiffs - Appellants,

     v.

SOUTH CAROLINA DEPARTMENT OF MENTAL HEALTH,

               Defendant - Appellee.

─────────────

Appeal from the United States District Court for the District of South Carolina, at Columbia. Joseph F. Anderson, Jr., Senior District Judge. (3:12-cv-01754-JFA)

─────────────

Argued: May 12, 2015              Decided: July 7, 2015

─────────────

Before SHEDD, DUNCAN, and HARRIS, Circuit Judges.

─────────────

Vacated and remanded by unpublished opinion. Judge Harris wrote the opinion, in which Judge Shedd and Judge Duncan joined.

─────────────

**ARGUED**: James Paul Porter, J. LEWIS CROMER & ASSOCIATES, LLC, Columbia, South Carolina, for Appellants. Vance J. Bettis, GIGNILLIAT, SAVITZ & BETTIS, LLP, Columbia, South Carolina, for Appellee. **ON BRIEF**: James Lewis Mann Cromer, J. LEWIS CROMER & ASSOCIATES, LLC, Columbia, South Carolina, for Appellants.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Barry Harrison and two colleagues appeal the grant of summary judgment to their employer, the South Carolina Department of Mental Health ("DMH" or "the Department"), on race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964. Harrison and his colleagues (collectively, "plaintiffs") settled a prior race discrimination suit against the Department in 2010. They now allege that a number of actions taken by DMH since then — including refusing to consider them for job assignments and giving raises to similarly situated DMH employees but not to them — constitute discrimination on the basis of their race and retaliation for their prior lawsuit. While we affirm the district court's grant of summary judgment to DMH in most respects, we remand certain claims related to the challenged raises for further factual development.

## I.

### A.

Barry Harrison, Wesley Roach, and Dwayne Hawkins are maintenance workers for the South Carolina Department of Mental Health. Each has worked for DMH for approximately thirty years and holds the title Trade Specialist IV ("TS-IV"), with "IV" indicating rank. Harrison, Roach, and Hawkins are generalists,

2

performing painting, carpentry, electrical, and plumbing work for the Building Maintenance section of DMH's Physical Plant Services department as needed.

In 2009, Harrison, Roach, and Hawkins, who are black, filed a lawsuit accusing DMH of discriminating against them on the basis of their race in their pay and in failing to promote them (the "2009 lawsuit"). The parties agreed to settle the suit on December 30, 2010. The settlement agreement (the "2010 settlement") called for DMH to make two forms of payments to Harrison, Roach, and Hawkins. First, DMH agreed to make a single $100,000 lump-sum payment that was to be split by Harrison, Roach, and Hawkins after they paid their attorneys' fees and costs. Second, DMH agreed to increase the men's salaries by $4,000 per year, pending approval by the South Carolina Budget and Control Board's Office of Human Resources. This increase was made retroactively effective from 2006, and will extend until 2016 — more specifically, until the January 31, 2016, date on which the men agreed to resign from their jobs with DMH.

The 2010 settlement did not, however, mark the end of these workers' concerns about racial discrimination at DMH. In response to a budgetary shortfall, DMH's Physical Plant Services department, where the plaintiffs work, underwent a significant reorganization in July of 2011. DMH consolidated its four

3

existing maintenance shops into two, and gave many employees new responsibilities or transferred them to different locations. Specifically, the Department transferred two of the four supervisors of its pre-consolidation maintenance shops, all of whom were white, into the supervisor positions for the two consolidated shops. The two remaining shop supervisors were then given different supervisory roles, one as a building manager and the other as a supervisor at an energy plant. Harrison, Roach, and Hawkins testified that they would have applied for any of these four positions had DMH made them available to applicants.

While the four maintenance shop supervisors had a higher rank than the plaintiffs, the plaintiffs claim that DMH also officially or unofficially promoted three white employees with the same TS-IV position and rank as them: one who was made a preventive maintenance supervisor in the heating, ventilating, and air conditioning unit; another who took on new supervisory responsibilities; and a third who became a supervisor over the plumbing unit. According to the plaintiffs, the first two of these "promotions" were granted without a competitive application process; the third, they say, was advertised as open only to current members of the plumbing unit, which they claim unfairly excluded general maintenance workers who nevertheless had extensive plumbing experience, such as themselves. However,

4

the first two of the alleged promotions did not come with an increase in pay or rank, and the plaintiffs admit that they never actually applied for the position in the plumbing unit, or spoke to their human resources manager about whether they could apply.

In September 2011, less than a year after the settlement of the 2009 lawsuit, DMH gave salary raises to all TS-IVs with fifteen or more years of experience except for Harrison, Roach, and Hawkins (the "September 2011 raises"). It is undisputed that this raise was based at least in part on a "compression" study DMH had undertaken before the 2010 settlement, showing that the salaries of certain experienced employees, including TS-IVs, were lagging behind statewide averages for comparable workers. According to DMH, the three plaintiffs were excluded because the $4,000 annual salary adjustment they received as part of the 2010 settlement was, in effect, a compression-based raise itself, so that a second raise would be redundant. DMH managers involved with authorizing the September 2011 raises testified that the salary adjustment given to Harrison, Roach, and Hawkins was a benchmark and "accelerant" for the 2011 raises given to other TS-IVs. Harrison, Roach, and Hawkins, however, deny that they understood the salary adjustment to be a correction for salary compression. The text of the settlement agreement makes no reference to a compression study, and does

5

not explain the nature of the $4,000-per-year adjustment or how the figure was calculated.

The plaintiffs now allege that these raises were allocated in a discriminatory and retaliatory manner, and that they produced a new pay imbalance among TS-IVs. Using salary charts that DMH provided in discovery, they calculate that in 2012, Harrison, Roach, and Hawkins were paid on average $950 less than white TS-IVs with comparable experience, and $160 less than other black TS-IVs. In 2013, they find, black TS-IVs were paid on average $1,000 a year less than white TS-IVs, and Harrison, Roach, and Hawkins were paid $1,100 less than white TS-IVs and $100 less than other black TS-IVs.

**B.**

Claiming that in these and other matters DMH discriminated against them on the basis of race and retaliated against them for bringing their 2009 lawsuit, Harrison, Roach, and Hawkins brought an action under Title VII in the District of South Carolina in June 2012. The plaintiffs amended their complaint in December 2013 in order to incorporate events that occurred after filing. DMH moved for summary judgment, and in August 2014, a magistrate judge filed a report and recommendation that summary judgment be granted to DMH on both the discrimination and retaliation claims.

6

The magistrate judge agreed with the plaintiffs that they had administratively exhausted their Title VII claims, including their disparate pay claims, by adequately presenting them to the Equal Employment Opportunity Commission ("EEOC"). But on the merits, the magistrate judge concluded that the plaintiffs' claims failed, whether considered under the so-called direct proof method or under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

As to the September 2011 raises, the magistrate judge determined that the $4,000-per-year adjustment provided the plaintiffs by the 2010 settlement was in fact a compression raise, and that the three plaintiffs were excluded from the round of compression raises awarded in September 2011 only because they already had received such raises. Moreover, the magistrate judge noted, some of the TS-IVs who did receive raises in 2011 were black. As a result, according to the magistrate judge, the plaintiffs had not made out a triable case that denial of the September 2011 raises was either retaliatory or discriminatory.

The magistrate judge similarly rejected the plaintiffs' claim of pay disparities based on race and retaliation following the September 2011 raises. Those claims, the magistrate judge determined, rested on inadequate data concerning historical wage

7

payments, based on the plaintiffs' own calculations and offered without the necessary context.

None of the plaintiffs' other allegations presented close questions, according to the magistrate judge. The allegations related to the restructuring of the Physical Plant Services department, the magistrate judge reasoned, should be treated as "failure to promote" claims, which require a plaintiff to show that there was an "open" position for which he qualified but was not selected. The reshuffling of the four pre-consolidation maintenance shop supervisors into different supervisory roles, on the other hand, amounted to lateral transfers rather than the filling of "open" positions. Likewise, as to the plaintiffs' allegations that they were unlawfully excluded from consideration for other positions, the magistrate judge found either that the position in question was not an opening or promotion, that the plaintiffs had failed to attempt to apply, or that the plaintiffs could not establish that they were qualified. Finally, the magistrate judge found that none of the other DMH actions of which the plaintiffs complained rose to the level of a change in the terms of employment or a "materially adverse" action, as required to state a claim for discrimination or retaliation under Title VII.

In September 2014, the district court issued an opinion responding to the plaintiffs' specific objections to the

8

magistrate judge's report and affirming the magistrate judge's reasoning on each point. The district court then adopted the magistrate judge's report and recommendation in full and granted summary judgment to DMH on all claims. This appeal followed.

## II.

We review the district court's grant of summary judgment de novo, and we view the facts in the light most favorable to the plaintiffs, as the non-movants. See Stuart v. Camnitz, 774 F.3d 238, 244 (4th Cir. 2014).

Title VII prohibits employment discrimination on the basis of an employee's membership in a protected class and retaliation based on an employee's opposition to "any practice made [] unlawful" by Title VII, including participation in a Title VII "investigation, proceeding, or hearing." 42 U.S.C. §§ 2000e-2,-3. Whereas the types of employment actions that may be challenged in a discrimination suit are limited in kind by the text of § 2000e-2(a) to those affecting the "compensation, terms, conditions, or privileges of employment," any "materially adverse" employment action — one that could have "dissuaded a reasonable worker from making or supporting a charge of discrimination" — is actionable in a retaliation suit. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

9

On appeal, the plaintiffs contend that the district court erred in granting summary judgment to DMH because they have made out a triable case of both these forms of Title VII violations, primarily in connection with raises, wages, and promotions. For the reasons given below, we affirm the district court with respect to most of the plaintiffs' claims but remand for additional fact-finding regarding claims related to the 2011 raises and subsequent pay disparities.

**A.**

We begin with the many respects in which we affirm the district court's decision. As described above, the plaintiffs have challenged a series of personnel decisions, alleging that DMH failed to promote them or to consider them for various positions in violation of Title VII. We agree with the district court that the plaintiffs have failed to make out a case of either discrimination or retaliation in connection with those decisions, and that DMH is entitled to summary judgment on the claims.

As the district court explained, many of the positions for which the plaintiffs allege they were passed over were not "open" positions, as required to show disparate treatment in promotions. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996); see also McDonnell Douglas, 411 U.S. at 802 (addressing rehiring of discharged employees).

10

Instead, the unrefuted evidence shows that the personnel actions in question were lateral transfers necessitated by the restructuring of the Physical Plant Services department, in which existing shop supervisors, senior to plaintiffs, remained shop supervisors or assumed new supervisory roles. As the district court held and the magistrate judge explained in detail, these lateral transfers cannot give rise to a failure to promote claim.

With respect to the supervisory job in the plumbing unit, we again agree with the district court that plaintiffs have failed to make out a case. It is undisputed that the plaintiffs did not apply or attempt to apply for that position, and that is enough to defeat their claims as a matter of law. See Evans, 80 F.3d at 959 (plaintiff must have applied or "sought to apply" for position to make out claim under Title VII). And we agree with the district court that the plaintiffs have failed to show that the grant of additional responsibilities to two other employees constituted promotions or the filling of open positions.

Finally, we agree with the district court that on the facts alleged in this case, none of the other actions of which the plaintiffs complain, unrelated to promotions or to the pay and raise issues we turn to next, affect the "terms, conditions, or status of employment" as required to make out a discrimination

11

claim under Title VII, or constitute the kind of "materially adverse" action sufficient to give rise to a retaliation claim.

**B.**

We turn now to the September 2011 raises, and to the plaintiffs' retaliation claim in connection with those raises. According to the plaintiffs, by awarding the September 2011 raises to every TS-IV employee other than the three of them, DMH retaliated against them for bringing their earlier 2009 race-discrimination suit against the Department. On this claim, an award of summary judgment to DMH was premature, because the issue cannot be decided as a matter of law without further factual development regarding the 2010 settlement.

This is an unusual case, in that most of the facts required to make out a retaliation claim are not in dispute. First, there is no question that in bringing their 2009 lawsuit against DMH for failure to promote and pay discrimination based on race, the plaintiffs engaged in exactly the kind of activity that Title VII protects against a retaliatory response. See 42 U.S.C. § 2000e-3 (protected activity includes participation in a Title VII "investigation, proceeding, or hearing"); Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004); see also Gilbert v. Napolitano, 670 F.3d 258, 263 (D.C. Cir. 2012) ("[B]ringing discrimination charges undoubtedly qualifies as protected activity."). Second, DMH admits that the 2010 settlement of

12

that lawsuit is the reason that the plaintiffs did not receive the September 2011 raises. Indeed, that is the whole theory of DMH's defense on this claim: that because the plaintiffs received pay adjustments as a result of their 2009 litigation against the Department, they were not given additional raises in 2011. That is enough to satisfy the "but-for" causation required of a retaliation claim. See Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013). And finally, it is clear that if DMH deprived Harrison, Roach, and Hawkins in 2011 of a raise given to all other similarly situated employees, then that would be a "materially adverse" employment action for purposes of Title VII's retaliation provision. See Burlington Northern, 548 U.S. at 68 (action taken in response to protected activity constitutes prohibited retaliation if it is "materially adverse" in that it could have "dissuaded a reasonable worker from making or supporting a charge of discrimination").

As the case comes to us now, then, the key question is whether Harrison, Roach, and Hawkins actually were deprived of the September 2011 raises, or whether, as DMH argues, they in fact received the September 2011 raises, in the form of the pay adjustments that were part of the 2010 settlement. It is only with the benefit of appellate briefing and argument that the critical nature of that question becomes clear. As a result, what turns out to be a core factual dispute about the nature of

13

the parties' 2010 settlement agreement was never squarely joined in the proceedings below.

On the one hand, it appears to be undisputed that the September 2011 raises for the plaintiffs' fellow TS-IVs were prompted at least in part by long-standing DMH concerns, predating the 2009 lawsuit, regarding "salary compression," or a lack of differentiation between the salaries of experienced and inexperienced employees that left experienced employees undercompensated relative to statewide averages. And multiple DMH managers testified that the $4,000 annual salary adjustment received by the plaintiffs pursuant to their 2010 settlement also was designed to correct for salary compression, and was thus effectively an early version of the same compression-based raises that other TS-IV employees received in September 2011.

On the other hand, the plaintiffs insist that they did not understand the settlement agreement that concluded their 2009 lawsuit to incorporate pay raises adjusting for salary compression. In his deposition, Harrison expressly denied that the pay adjustment provided for in the settlement agreement was the equivalent of the compression-based September 2011 raises. And the language of the settlement agreement describes neither the nature of the annual salary adjustments nor the way in which the $4,000 figure was calculated, shedding no light on whether $4,000 per year over ten years represents a compression-based

14

adjustment, as DMH would have it, or simply the price DMH was willing to pay in exchange for settling each plaintiff's 2009 race-discrimination claim.[1]

We do not think that the critical question of whether the parties' 2010 settlement agreement effectively granted the plaintiffs the same compression-based raise that other employees received in September 2011 can be resolved as a matter of law on the record as it now stands. The interpretation of settlement agreements is governed by general principles of contract law. See Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 211 (4th Cir. 2009); Pee Dee Stores, Inc. v. Doyle, 672 S.E.2d 799, 802 (S.C. Ct. App. 2008). Application of those principles requires evidence that is missing from this record — evidence contemporaneous to the signing of the settlement agreement,

---

[1] The relevant portion of the settlement agreement reads:

> Subject to approval by the South Carolina Budget and Control Board's Office of Human Resources, SCDMH will increase each of Plaintiff's current salaries by Four Thousand Dollars ($4,000) annually, retroactive to June 2, 2006, and will pay each of Plaintiffs backpay associated with the retroactive salary increase, less applicable taxes, employee contributions to retirement, and other required withholding. . . . If the South Carolina Budget and Control Board's Office of Human Resources approves the retroactive salary increases authorized by this paragraph, SCDMH will make required employer contributions to the South Carolina Retirement System on behalf of each of Plaintiffs to account for the retroactive adjustment in Plaintiffs' respective salaries. J.A. 174.

15

bearing on both parties' understanding of its terms. DMH has presented deposition testimony regarding the Department's current view of what was intended in 2010, when the settlement agreement was negotiated. But the DMH managers who testified provided no evidence that this view was memorialized or communicated at that time, or that it was shared by the plaintiffs. Indeed, with candor that we appreciate, DMH's able lawyer conceded at argument that there is no evidence in the present record indicating that the plaintiffs understood the pay adjustments provided in their settlement agreement as compression-based raises.

Accordingly, we believe there is a need for additional factual development regarding the 2010 settlement's salary adjustment and its relationship, if any, to the September 2011 raises. On remand, DMH will have the opportunity to present evidence contemporaneous to the settlement agreement regarding how the $4,000 annual salary adjustment was calculated and showing that the adjustment was understood by both sides to address salary compression; the plaintiffs, for their part, may present evidence that in 2010 the parties did not mutually agree that the salary adjustment provided for by the settlement

16

agreement was in the nature of a compression-based raise.[2]   If after further development the issue is ripe for decision as a matter of law, then the district court of course may grant a subsequent summary judgment motion.

## c.

Finally, we address the plaintiffs' claim that the September 2011 raises had ongoing and impermissible effects on wages, reintroducing a race-based disparity in pay between black and white workers generally, and also generating a disparity between the plaintiffs' wages and those of other black TS-IVs that is indicative of retaliation.   In support of their claim, the plaintiffs proffered a statistical analysis of salary charts for fiscal years 2012-13 and 2013-14 that, they say, shows white TS-IVs earning more than black TS-IVs generally, and both white and black TS-IVs earning more than Harrison, Roach, and Hawkins specifically.

Preliminarily, we agree with the district court that the plaintiffs properly exhausted this claim by pleading it in their EEOC charge.   DMH argues otherwise, pointing to the fact that the EEOC charge refers expressly only to the September 2011 raises, and not to wages in 2012 or 2013.   But as the plaintiffs' counsel clarified at argument, the two are

---

[2] If there is no evidence of a meeting of the minds on this point, the district court can address that issue.

intertwined; the calculations of pay disparity in 2012 and 2013 advanced by the plaintiffs in this suit are intended as evidence of the retaliatory and discriminatory effects of the September 2011 raises, and not of some independent harm. We construe EEOC charges "liberally" for these purposes, Bonds v. Leavitt, 629 F.3d 369, 379 (4th Cir. 2011), requiring only that the "factual allegations in the administrative charge [be] reasonably related to the factual allegations in the formal litigation," Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005), and like the district court, we are satisfied that the plaintiffs have met that standard here.

Turning to the merits, the plaintiffs framed their pay disparity claims around a series of DMH salary charts, provided by DMH during discovery, that list the salary, classification, race, and date of hire for employees in the Physical Plant Services department. From that raw data, the plaintiffs conducted what they describe as "basic math," calculating the averages of the salaries of DMH employees with particular roles, levels of experience, and race, and then the differences between those averages. It is those calculations that the plaintiffs rely on to show that after the 2011 raises, black TS-IVs were, on average, paid less than their white counterparts; and that the plaintiffs, in particular, were paid less than both white and black comparators.

18

The district court found the plaintiffs' charts and statistical data wanting, and we understand the court's hesitation. As the magistrate judge explained, there are cases in which "basic math" is no substitute for expert statistical analysis, which can ensure that undue weight is not given to statistically insignificant disparities. See Moultrie v. Martin, 690 F.2d 1078, 1082 (4th Cir. 1982). Moreover, DMH raised substantial questions about the failure of the plaintiffs' data to distinguish between "specialized" TS-IVs — professionally licensed electricians, plumbers, carpenters, and the like, who command higher salaries in the job market — and unspecialized TS-IVs, including the plaintiffs. Because that information might have revealed legitimate grounds for pay disparities, it should be accounted for in the data set and analysis, if possible. Cf. Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 54 (2d Cir. 2014) (Title VII comparators should be similar in all "material" respects).

On the other hand, we cannot overlook DMH's own responsibility for the deficiencies in the plaintiffs' data set. The plaintiffs are working, as they must, from information provided to them by DMH in discovery — here, DMH salary charts that do not identify or differentiate "specialized" TS-IVs. And according to the plaintiffs, DMH's discovery responses included no other information that would have allowed them to

19

distinguish among TS-IVs on the basis of level of experience, education, or skill.

Courts often have remanded Title VII cases for further factual development when a first round of discovery has failed to produce information relevant to whether purported comparators are "similarly situated" to a plaintiff, see, e.g., Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 753 (6th Cir. 2012); Paquin v. Fed. Nat'l Mortg. Ass'n, 119 F.3d 23, 28 (D.C. Cir. 1997), and we think that is the best course to follow here.  On remand, the plaintiffs may present, as evidence of disparate pay, data and calculations based on the 2012–13 and 2013–14 salary charts provided by DMH in discovery, though the district court is free to impose conditions and safeguards — including a requirement of expert testimony to contextualize the data — that it deems necessary.  DMH, in turn, may turn over evidence regarding pay differentials based on "specialization," along with any other evidence it considers relevant to identifying the plaintiffs' proper comparators for purposes of their pay disparity claims.

**III.**

The district court properly granted summary judgment to DMH on many of the plaintiffs' Title VII claims.  But with the benefit of appellate briefing and argument, and the refinement

20

of the issues that they bring, we conclude that the plaintiffs'
claims related to the September 2011 raises and subsequent pay
disparities cannot be decided on summary judgment on the record
as it now stands, and instead require further factual
development.  We therefore vacate the grant of summary judgment
on those claims and remand the case for further proceedings
consistent with this opinion.

<u>VACATED AND REMANDED</u>